(304 P.3d 696)
No. 102,862

In the Matter of the Care and Treatment of LENNY D. LOWRY.

Opinion filed June 8, 2012.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, for appellee.

Before STANDRIDGE, P.J., MCANANY and ATCHESON, JJ.

STANDRIDGE, J.: A jury determined Lenny D. Lowry was a sexually violent predator under the Kansas Sexually Violent Predator Act (KSVPA), K.S.A. 59-29a01 *et seq.* Lowry appeals from the

jury's verdict, arguing that the district court lacked jurisdiction over him, that he was denied his statutory right to effective assistance counsel, and that the State's attorney committed reversible misconduct during closing arguments. Because we find no merit to any of these arguments, we affirm the jury's verdict.

## FACTS

Lowry was convicted in 1989 of two counts of aggravated incest. The victim was his 12-year-old son. In 1993, Lowry was convicted of two counts of sexually exploiting a 10-year-old child. The 1993 convictions occurred while Lowry was on parole for the 1989 convictions, after Lowry had completed a sex offender treatment program in prison and contemporaneously with Lowry's participation in an outpatient sexual offender treatment program.

As Lowry's prison term for the 1993 convictions neared its end, the State filed a petition requesting civil commitment of Lowry as a sexually violent predator. The court appointed Mark Sevart to represent Lowry and thereafter conducted a probable cause hearing. The court ultimately found the evidence established probable cause to believe that Lowry was a sexually violent predator and, as a result, ordered Lowry to undergo an evaluation at the Larned State Security Hospital (Larned). Dr. Greg Shannon, under the supervision of Dr. John Reid, evaluated Lowry at Larned. After the evaluation process was complete, Lowry returned to district court for trial so that a jury could determine whether Lowry was a sexually violent predator under the KSVPA.

Prior to trial, the State's attorney and Sevart stipulated to the foundation of a file consisting of 2,338 documents reviewed by the doctors evaluating Lowry. These documents included police reports, records of prior legal proceedings, records from the Kansas Department of Corrections (KDOC), and mental health records. The State described the nature of the stipulation in a document it filed with the court:

"[The State] believes the parties have agreed to stipulate to the foundation for the [2,338 pages of] documents in discovery. Specifically, neither side will be required to produce a custodian of records from Larned State Hospital, the Department of Corrections of Kansas or any other State or jurisdiction, or the crim-

inal clerk of any jurisdiction where [Lowry] is alleged to have committed a crime, to provide foundation for the admission, pursuant to K.S.A. 60-460(m) business records hearsay exception, prior to the admission of said documents. Similarly, neither side will be required to produce a certified shorthand reporter to provide foundation for the use of a transcript from prior testimony of any witness.

"The parties reserve the right to object at the time of trial to the admission of said documents on grounds other than foundation, including but not limited to objections based on hearsay and relevance.".

The parties' stipulation also included an agreement by the parties that the documents would be admitted for the limited purpose of an appellate record and, although any of the documents could be used to question the experts testifying at trial, the jurors would not have access to the documents during their deliberations.

At trial, the State presented the testimony of Drs. Reid and Shannon. Dr. Reid, a psychologist at Larned, testified that he regularly performed evaluations at the hospital in order to determine whether, in his opinion, a particular individual was a sexually violent predator under the KSVPA. Dr. Reid estimated he had performed 40 such evaluations in the past and determined about 50 percent of the time that the individual evaluated was a sexually violent predator. In addition to conducting evaluations, Dr. Reid supervised other staff members at Larned who performed the evaluations. In this case, Dr. Reid supervised Dr. Shannon, the staff member who was assigned to evaluate Lowry. Specifically, Dr. Reid participated in Dr. Shannon's 45-minute interview of Lowry and examined Dr. Shannon's evaluation and report.

Dr. Reid testified that an important component of the evaluation process is a determination regarding whether the individual evaluated has accepted responsibility for his or her past actions. Dr. Reid noted that accepting responsibility for past actions demonstrates the individual has changed his or her behavior and thus is unlikely to reoffend in the future. Dr. Reid testified that during Lowry's 45-minute interview, Dr. Shannon asked Lowry about the circumstances surrounding his 1993 convictions for sexual exploitation of a child. Lowry responded that he was not going to deny that the acts occurred but explained that he had told the children he did not care what they did in his home as long as they did not

hurt themselves. Dr. Reid testified Lowry's explanation indicated that Lowry was not willing to take responsibility for his past actions.

Dr. Reid noted that Lowry had been through a sex offender treatment program while incarcerated but found no evidence—based on his interview with Lowry and his review of Dr. Shannon's report—that Lowry had benefitted from the treatment he received. Specifically, Dr. Reid noted that Lowry reoffended in 1993 while on parole from his first convictions after receiving treatment in prison.

Based on his observation of Dr. Shannon's interview with Lowry, his review of Dr. Shannon's report and evaluation of Lowry, and his subsequent discussion with Dr. Shannon about the report and evaluation, Dr. Reid testified he agreed with the conclusions drawn by Dr. Shannon, which diagnosed Lowry as suffering from the mental abnormalities of pedophilia, nonexclusive (attracted to both adults and children) and alcohol dependence in a controlled environment. Dr. Reid testified that he also agreed with Dr. Shannon's conclusion that Lowry suffered from antisocial personality disorder. Finally, Dr. Reid testified that he agreed with the ultimate conclusion in Dr. Shannon's report finding Lowry to be a sexually violent predator.

On cross-examination, Dr. Reid admitted that during the time Dr. Shannon was conducting Lowry's evaluation and completing the report, Dr. Shannon was not licensed as a doctor of psychology in Kansas. Dr. Reid also admitted not knowing whether Dr. Shannon had completed all of the course work necessary to earn a doctorate during the time period in question. Dr. Reid conceded Dr. Shannon's evaluation of Lowry was either the first or second evaluation ever completed by Dr. Shannon and that because Dr. Shannon had performed most of the interviews of Lowry outside of Dr. Reid's presence, Dr. Reid could not know for sure whether Dr. Shannon performed the interviews correctly.

Although initially refusing to permit this line of questioning on cross-examination, the district court ultimately permitted Sevart to ask Dr. Reid about three instances in which Dr. Reid's staff had evaluated individuals who ultimately were not deemed to be sexually violent predators by the hospital staff, notwithstanding the

fact that each of the individuals had committed sexual offenses that arguably were much worse than those committed by Lowry. Dr. Reid conceded during this cross-examination that one of the individuals evaluated had received a higher score on the Static-99 test (an actuarial test used to determine the chances of a person committing a new sexual offense once he or she is released from prison) than the score Lowry received on the same test.

On redirect-examination, Dr. Reid explained that past offenses, regardless of how objectionable they may have been, were not the sole factor for determining whether an individual qualified as a sexually violent predator. With regard to his confidence in Dr. Shannon's work, Dr. Reid said that he believed Dr. Shannon was qualified to perform Lowry's evaluation. Dr. Reid also said that he found nothing in the evaluation to indicate that Dr. Shannon did not meet the highest standards of the psychiatric profession in completing the report.

Dr. Shannon testified that his duties at Larned included performing competency and sexually violent predator evaluations. Dr. Shannon stated that at the time he evaluated Lowry, he had received his doctorate in psychology but had not received his temporary license (a temporary license can only be issued to a person with a doctorate in psychology). At the time of trial, Dr. Shannon had received his temporary license but was awaiting his results from the national licensure examination.

In describing the process of conducting an evaluation to determine whether a person is a sexually violent predator, Dr. Shannon said:

"There are several pieces then to such an evaluation. We want to do a clinical interview and look at the biopsychosocial aspect of the individual; what life was like growing up, developmental kind of issues. That's one set of data.

"We may do testing as a second piece of data. We do record reviews from various records from various sources. Perhaps treatment records from past hospitalizations, records from the Department of Corrections, records from the sex offender treatment program the individual may have gone through.

"So it's a very comprehensive review of the individual."

Dr. Shannon said that in considering whether Lowry was a sexually violent predator, he reviewed the 2,338 pages of documents

contained in Lowry's file, interviewed Lowry for about 8 hours over the course of 1½ months, and had Lowry perform two personality tests and an aggression questionnaire. Dr. Shannon stated that the results from one of the personality tests were invalid because the responses Lowry gave to the questions on the test (true or false questions) were inconsistent and indicated that Lowry was trying to portray himself in an overly positive light. Although the results from the other personality test also indicated that Lowry was not being completely honest in answering questions, Dr. Shannon did not believe the indicators were strong enough to render the test results invalid. Dr. Shannon noted, however, that the responses on this test suggested that Lowry did not believe he suffered from problems which are common to most people.

During his interview with Lowry, Dr. Shannon said that Lowry described his childhood as troubled. Lowry reported dropping out of high school when he was 16 years old and getting married when he was 21 years old. Two children resulted from this relationship.

Dr. Shannon testified that Lowry reported limited legal troubles in his life but not to the extent set forth in Lowry's official file. For instance, during his interview, Lowry failed to tell Dr. Shannon about being charged in 1981 with impersonating an officer and escaping from custody. The impersonating an officer charge was ultimately dismissed, but Lowry was convicted of escaping from custody.

When Lowry was asked about the 1989 convictions for aggravated incest involving his then 12-year-old son, Lowry told Dr. Shannon that he was trying to teach his son that he loved him. Lowry also explained that he engaged in sex acts with his son after his son asked him about homosexual sex. Lowry mentioned in passing that after going through a sex offender treatment program, he realized that his behavior was inappropriate.

With regard to Lowry's 1993 convictions for sexual exploitation of a child, Dr. Shannon said that Lowry did not provide much information to him about the underlying facts other than stating that he encouraged children to be free inside his home, to run naked, and to do what they wanted. Dr. Shannon noted, however, that the records from that case reflect that Lowry was convicted of

two counts of sexual exploitation based on his act of setting up a video camera inside his home and persuading a 10-year-old boy to take his clothes off and fondle himself in front of the camera. Nevertheless, Lowry failed to acknowledge during his interview that he violated the child. Dr. Shannon also reviewed a statement about the incident that Lowry wrote while participating in a prison sex offender treatment program between September 1996 and February 1998. In the statement, Lowry admitted to providing cigarettes and alcohol to children in order to persuade them to engage in sex acts. Dr. Shannon noted that the 1993 incident occurred while Lowry was on parole and participating in an outpatient sexual offender treatment program and after he had received sex offender treatment in prison.

Dr. Shannon testified that an individual who successfully has completed a sex offender treatment program will be very honest in describing past thoughts, fantasies, and actions and will acknowledge the harm caused to his or her victims. Dr. Shannon reported that Lowry did not display these characteristics during his interview. Dr. Shannon said that when Lowry spoke about his past sexual transgressions, he appeared to downplay their significance and did not take full responsibility for his actions. Dr. Shannon also said that Lowry did not display empathy for his victims or recognize the harm that he had inflicted on them.

Dr. Shannon noted that Lowry had drafted a relapse prevention plan in February 1998 while participating in the prison sex offender treatment program. In his plan, Lowry described his victims as male and female, ages 10 to 13 years old, and described his sex acts as voyeurism, fondling genitals, masturbating, and/or performing oral sex. When Dr. Shannon asked Lowry about the conditions that "trigger" his desire to engage in deviant sex acts, Lowry described his triggers as secrecy, dependency on work, stress, eating junk food, consuming alcohol, and not taking care of himself. Dr. Shannon believed those triggers were the same ones Lowry described in his prior relapse prevention plan. Other than vague references to joining a support group or being involved in community activities, Lowry did not explain how he planned to prevent those triggers from occurring.

Lowry noted in his 1998 prevention plan that, if released from prison, he would join an Alcoholics Anonymous group, involve himself in a support group, and join a church group. When Dr. Shannon asked Lowry about his current prevention plan, Lowry described doing essentially the same things to prevent himself from reoffending. Dr. Shannon said Lowry's 1998 relapse prevention plan and his current plan were both "woefully inadequate." In fact, Dr. Shannon noted that after Lowry completed sex offender treatment in 1998, he was issued two disciplinary reports involving sexual behavior with another inmate. The most recent disciplinary report was issued in 2005. Based on the information gleaned from Lowry and his file during the evaluation, Dr. Shannon concluded that the sexual offender treatment program in prison failed to rehabilitate Lowry.

As a result of the evaluation process, Dr. Shannon diagnosed Lowry as suffering from the mental disorders of pedophilia, nonexclusive (attracted to children and adults) and alcohol dependence in a controlled environment—meaning Lowry currently was in an institutional setting where alcohol was not available, but the issue of alcohol dependence had not been fully addressed clinically. Dr. Shannon also diagnosed Lowry as suffering from antisocial personality disorder, which causes the sufferer to have a pervasive disregard for the rights of others. Dr. Shannon stated that a person with antisocial personality disorder is generally described as being callous, unemotional, perhaps impulsive, and unable "to recognize the emotional state of another." Dr. Shannon further stated that Lowry's disorders and his lack of response to treatment indicated that Lowry lacked "the volitional capacity to control his impulses," making it likely that Lowry would engage in future acts of sexual violence. In support of this conclusion, Dr. Shannon referenced results from the Static-99 test and the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R) he administered to assess the likelihood of Lowry committing a new sex offense after being released from prison. On the Static-99, Lowry scored a 6, placing Lowry in the high risk category with a sexual recidivism risk of 36 percent within 5 years, 44 percent within 10 years, and 51 percent within 15 years. On the MnSOST-R, Lowry scored a 7, placing him

within the moderate category for sexual recidivism with a 29 percent risk of reoffending within 6 years.

In response to Dr. Shannon's testimony on direct examination, Sevart conducted an extensive and aggressive cross-examination of the doctor. Counsel presented Dr. Shannon with various documents from Lowry's file to demonstrate that Dr. Shannon selectively extracted from the file only those documents unfavorable to Lowry and ignored those documents in Lowry's file that were favorable. For instance, Dr. Shannon conceded that he did not include within his report a statement from Lowry's son about the circumstances surrounding the 1989 convictions. Lowry's son stated that his father had gotten carried away teaching him about girls and "the birds and the bees." Lowry's son asked that his father not be put in prison and that he receive counseling for his drinking problem. Finally, the son said that he forgave Lowry for what he had done.

Additionally, Dr. Shannon conceded that his report focused primarily on Lowry's past behavior and did not include some of his more recent accomplishments. For example, Dr. Shannon also conceded that he mentioned Lowry's work history as a child and teenager but failed to include any information in his report regarding the positive reviews Lowry received from an employer in 1989 or that, while incarcerated, Lowry was trusted to work in the kitchen of a minimum security facility. Dr. Shannon noted in his report that Lowry had dropped out of high school in the 10th grade but failed to include the fact that Lowry received his GED and a diploma from a technical college while in prison. Dr. Shannon acknowledged that he failed to document Lowry's statement in 1998 that if released from prison, he would live in an adult apartment complex, he would attend counseling, and he would try to find a job that he could advance in and enjoy. Finally, Dr. Shannon acknowledged he did not include in his report the fact that Lowry successfully had completed a substance abuse program in April 1996 and a mental health treatment program in October 1998.

Sevart also questioned Dr. Shannon about the manner in which he scored Lowry's responses on the Static-99. At first, Dr. Shannon admitted he made mistakes in calculating the score. Upon further

review, however, Dr. Shannon told the jury on redirect-examination that he had misspoken about making errors in the calculation and that Lowry's original score of 6 was correct. Regardless, Dr. Shannon acknowledged that the Static-99 test does not give credit for completing sex offender treatment and that the MnSOST-R actually assigns a higher score to a person with a shorter history of sexually deviant behavior than compared to a person with a longer history.

Dr. Shannon also testified on cross-examination about documents contained in Lowry's file related to his mental health between February 2003 and September 2005. Sevart elicited testimony from Dr. Shannon about an April 26, 2005, treatment note that identified Lowry's mental health problem as grief issues and thereafter recommended grief counseling (not sex offender treatment) to address this problem. But Dr. Shannon explained that the treatment recommended did not stem from a general or comprehensive evaluation of Lowry, but instead was in response to a particular issue presented by Lowry at the time.

Sevart then presented Dr. Shannon with other mental health treatment notes that omitted any reference to Lowry ever receiving a diagnosis of pedophilia. With regard to one of these documents, Dr. Shannon responded that the notes were not documented properly and thus failed to affirmatively rule out the possibility that the evaluator would have diagnosed Lowry as suffering from pedophilia. At this point, counsel accused Dr. Shannon of intentionally disregarding documents in Lowry's file that failed to support his diagnosis of Lowry. This drew an objection from the State, which the district court sustained.

Sevart also questioned Dr. Shannon about a discharge summary from 1998 detailing Lowry's performance in sex offender treatment. Dr. Shannon conceded that this program was probably better than the one Lowry attended during his first stint in prison but noted that the author of the summary gave Lowry only an average chance of following the program's recommendations. Dr. Shannon also admitted that the program's recommendations could be achieved through Lowry's parole plan, which counsel thereafter

introduced into evidence. The plan reflected that Lowry would be on parole until July 2020.

When Sevart finished cross-examination, Dr. Shannon testified on redirect examination that Lowry's work history and prison education, while commendable, were not relevant to making an ultimate determination in this case. Dr. Shannon found it significant that Lowry's 1998 relapse prevention plan stated he was open to options and recommendations to help him prevent relapse once released. Dr. Shannon testified such a statement indicates that Lowry had failed to establish a personal plan to effectively control himself once he was released on parole.

After Dr. Shannon was through testifying, the State rested. Sevart did not present any evidence on Lowry's behalf. During closing argument, Sevart argued the State had failed to establish beyond a reasonable doubt that Lowry was a sexually violent predator. Specifically, Sevart argued the documents used to question Dr. Shannon established that Lowry was never diagnosed with a mental abnormality (other than alcoholism) by any of the prison staff who worked with him on mental health issues in prison. Sevart further argued that there were no documents in Lowry's prison file recommending that he be sent to Larned.

Sevart reminded the jury that Lowry had been through extensive sexual offender and drug and alcohol treatment programs while in prison and had a comprehensive parole plan in place that would ensure he would not reoffend. In addition, Sevart pointed out that Lowry was educated, marketable, and had received favorable reviews while he was working. Finally, Sevart noted that prison officials had trusted Lowry to work in the prison kitchen and in minimum security settings.

With regard to Dr. Shannon's testimony, Sevart suggested to the jury that Dr. Shannon was a biased witness who relied only on those documents in Lowry's extensive file that supported his conclusions. Sevart also pointed out that Dr. Shannon had a hard time determining whether he had made a mistake in scoring Lowry's Static-99 test. Sevart also attacked the reliability of the Static-99 and MnSOST-R tests in predicting Lowry's chances of reoffending. Sevart argued that the Static-99 did not give Lowry credit for com-

pleting a sexual abuse treatment program in prison, and Sevart argued that the MnSOST-R was illogical because it predicted that people with a longer history of committing sexual offenses would have a lesser chance of reoffending than compared to people with a shorter history. Finally, Sevart reminded the jury that Dr. Reid and his colleagues had found three individuals not to be sexually violent predators despite the fact that the sex offenses they committed were more egregious than Lowry's and the fact that they received higher scores on the Static-99 than Lowry.

Despite Sevart's efforts, the jury concluded that Lowry was a sexually violent predator. After denying Lowry's motions for judgment notwithstanding the verdict and a new trial, the district court ordered Lowry to be committed to Larned to undergo treatment. Lowry filed a timely notice of appeal and was appointed new counsel to represent him on appeal. Prior to briefing the appeal, Lowry filed a motion to remand his case to the district court for a *Van Cleave* hearing to determine whether his trial counsel provided ineffective assistance. See *State v. Van Cleave*, 239 Kan. 117, 119-20, 716 P.2d 580 (1986). This court granted the motion and, while retaining jurisdiction, remanded the matter to the district court to conduct a hearing.

At the hearing, Sevart described his defense strategy:

"Well, I felt that the record from the prison demonstrated that Mr. Lowry did not suffer from pedophilia or any other mental defect or disorder as enumerated under the sexual predator statute; that particular element of the offense just was not there.

"I also felt that he was not likely to reoffend; that there was insufficient evidence to support that; and that essentially his parole plan would be an appropriate disposition of his status or situation."

In preparing for trial, Sevart said that he reviewed the thousands of documents contained in Lowry's file and hired Dr. Robert Barnett to review Dr. Shannon's evaluation as well as other evaluations and documents contained in Lowry's file. Dr. Barnett ultimately interviewed Lowry at the Sedgwick County jail. After consulting with Dr. Barnett, Sevart determined Barnett's opinion was not helpful to Lowry and that Dr. Barnett's testimony at trial could be

damaging to Lowry's case. Sevart did not consult with another expert.

Sevart also testified about the parties' stipulation to the documents contained in Lowry's file. Sevart said he understood the stipulation permitted the parties to use any document in Lowry's file to question Dr. Reid and Dr. Shannon at trial. With that said, Sevart also believed the stipulation prohibited the parties from providing the documents to the jurors during their deliberations. Sevart conceded that the stipulation prevented the parties from objecting to the introduction of the documents based on hearsay but noted that the stipulation did not prevent the parties from lodging objections based on other objections, such as relevance or the evidence being cumulative.

Sevart said that he used the documents in Lowry's file to challenge Dr. Shannon's conclusions but noted that Dr. Shannon was a difficult witness who routinely questioned the validity or downplayed the significance of documents used to cross-examine him. Sevart believed Dr. Shannon's conduct at trial violated the parties' stipulation to the truth of the matters stated within any particular document. Sevart explained that the parties intended the documents contained in Lowry's file to speak for themselves, which eliminated the need for the author of a particular report to testify at trial about the report's validity.

Finally, and with regard to Sevart's failure to use two documents from Lowry's file to question Dr. Shannon's conclusions, Sevart agreed—based on the description of the documents provided to him at the *Van Cleave* hearing—that they would have been helpful in questioning Dr. Shannon and disputing his conclusions.

After closing arguments, the district court concluded that Sevart's representation of Lowry did not constitute ineffective assistance of counsel. Lowry then filed a second, timely notice of appeal.

## ANALYSIS

Lowry asserts the following three points of error on appeal: (1) The district court did not have jurisdiction in the proceedings below; (2) he was denied his statutory right to effective assistance

counsel; and (3) the State's attorney committed reversible misconduct during closing arguments. We address each point of error in turn.

## 1. *Jurisdiction*

Lowry contends the district court never acquired jurisdiction over him because the State's petition failed to allege sufficient facts to show that he was a sexually violent predator. Specifically, Lowry contends the petition references an attachment in support of the allegation that Lowry suffers from pedophilia, but there was never an attachment to the petition and one is not contained in the record on appeal. Given the referenced document was not attached, Lowry argues the petition failed to allege sufficient facts to initiate commitment proceedings and thus deprived the district court of jurisdiction over him.

Lowry's argument raises an issue of statutory interpretation, a question over which this court exercises unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009). Furthermore, whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *Steed v. McPherson Area Solid Waste Utility*, 43 Kan. App. 2d 75, 87, 221 P.3d 1157 (2010).

K.S.A. 59-29a04(a) states:

"When it appears that the person presently confined may be a sexually violent predator and the prosecutor's review committee appointed as provided in subsection (e) of K.S.A. 59-29a03 and amendments thereto has determined that the person meets the definition of a sexually violent predator, the attorney general, within 75 days of the date the attorney general received the written notice by the agency of jurisdiction as provided in subsection (a) of K.S.A. 59-29a03 and amendments thereto, *may file a petition in the county where the person was convicted of or charged with a sexually violent offense alleging that the person is a sexually violent predator and stating sufficient facts to support such allegation.*" (Emphasis added.)

Fatal to Lowry's claim here, subsection (b) of the statute specifically states that "[t]he provisions of this section are not jurisdictional, and failure to comply with such provisions in no way prevents the attorney general from proceeding against a person otherwise subject to the provision of K.S.A. 59-29a01 *et seq.*, and

amendment thereto." K.S.A. 59-29a04(b). Thus, even if Lowry's argument concerning the need to attach a document to the petition was true, it would not deprive the district court of jurisdiction.

Regardless, the petition clearly sets forth that (1) Lowry had been convicted of and sentenced for a sexually violent offense, *i.e.*, sexual exploitation of a child; (2) he has a history of sexual conduct demonstrating a mental abnormality or personality disorder; (3) his mental abnormality or personality disorder made him likely to engage in repeat acts of sexual violence; and (4) his condition makes it difficult for him to control his dangerous behavior. These factual allegations are sufficient to support the ultimate allegation in the petition that Lowry may be a sexually violent predator. See K.S.A. 59-29a02(a) (defining the term sexually violent predator); *In re Care & Treatment of Williams*, 292 Kan. 96, 106, 253 P.3d 327 (2011) (listing elements that must be proved beyond reasonable doubt in order to find that someone is a sexually violent predator).

## 2. *Assistance of Counsel*

Because commitment proceedings under the KSVPA are civil in nature, Lowry did not have a constitutional right to counsel, but he did have a statutory right. See K.S.A. 59-29a06(b) ("At all stages of the proceedings under [the KSVPA], any person subject to [the KSVPA], shall be entitled to the assistance of counsel, and if the person is indigent, the court shall appoint counsel to assist such person."); *In re Care & Treatment of Ontiberos*, 45 Kan. App. 2d 235, 237, 247 P.3d 686, *aff'd* 295 Kan. 10, 287 P.3d 855 (2012). When a person has a statutory right to counsel, he or she is entitled to receive *effective* assistance of counsel. *Cf. Robertson v. State*, 288 Kan. 217, 228, 201 P.3d 691 (2009) (once statutory right to counsel attaches in a K.S.A. 60-1507 proceeding, movant is entitled to effective assistance of counsel; appointment of counsel should not be a useless formality). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. [Citation omitted.]" *Crowther v. State*, 45 Kan. App. 2d 559, 563-64, 249 P.3d 1214, *rev. denied* 293 Kan. 1105 (2011).

Regardless of whether the right to effective counsel is based on the Sixth Amendment to United States Constitution or on a state statute, we apply the traditional, two-prong test to determine whether the right has been violated. See *Robertson*, 288 Kan. at 232 (after establishing that counsel's performance was deficient, a 60-1507 movant must establish that he or she was prejudiced by counsel's performance; the level of prejudice that must be established is the same as that imposed in constitutional cases).

"The first prong of the test for ineffective assistance of counsel requires a showing that counsel made errors so serious that his or her performance was less than guaranteed by the Sixth Amendment to the United States Constitution. [Citation omitted.] This prong requires a showing that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Our scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. This court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

"The second prong of the test for ineffective assistance of counsel requires a showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation omitted.]" *Crowther*, 45 Kan. App. 2d at 564.

To that end, Lowry contends Sevart's performance at trial was deficient in the following ways: (a) Sevart misconstrued the parties' stipulation to the foundation of the documents, which prevented Lowry from challenging unfavorable testimony provided by Dr. Shannon; (b) Sevart's cross-examination of Dr. Shannon was ineffective because he failed to use two specific documents to contest Dr. Shannon's conclusions regarding Lowry; (c) Sevart failed to argue that the State's evidence did not establish all of the elements of pedophilia contained in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV); and (d) Sevart failed to ask the district court for funds for an expert witness based on a mistaken belief that funds for such an expert were unavailable.

### a. *Sevart's Understanding of the Parties' Stipulation*

Lowry argues Sevart's testimony at the *Van Cleave* hearing established Sevart mistakenly believed that by stipulating to the foundation of the documents contained in Lowry's file, the parties agreed that the information contained in the documents was truthful. Lowry contends this mistaken belief caused Sevart to decide against calling any witnesses at trial to establish the validity of documents favorable to Lowry but construed as unfavorable by Dr. Shannon. Lowry further contends Sevart's mistaken belief about the stipulation allowed the State to present evidence at trial with no challenge from Sevart.

But even if, as Lowry argues, Sevart did not present a competing expert to challenge Dr. Shannon's unfavorable interpretation of documents on cross-examination and did not lodge an objection to Dr. Shannon's unfavorable interpretation of documents on direct examination, Lowry has failed to explain why Sevart's actions in this regard rise to the level of deficient performance. In fact, the trial transcript reflects that Sevart used numerous documents from Lowry's file to question Dr. Shannon in an attempt to show that the doctor had only considered negative information about Lowry to determine that he was a sexually violent predator. Sevart was successful in having Dr. Shannon admit (albeit temporarily) that he had made a mistake in calculating Lowry's Static-99 score. Sevart also questioned Dr. Shannon thoroughly about the mental health records contained in Lowry's file. Although Dr. Shannon downplayed the significance or challenged the validity of some of these documents, he also conceded that other documents showed that Lowry had been previously diagnosed as suffering from substance abuse and not pedophilia. Lowry fails to explain how these concessions by Dr. Shannon could have been enhanced at trial with expert testimony.

During Dr. Shannon's direct examination, Sevart prevented Dr. Shannon from testifying about two disciplinary reports that Lowry had received in prison for possessing obscene material. This is just one example of the numerous objections Sevart raised at trial during Dr. Shannon's testimony, and Lowry fails to identify other ob-

jections that Sevart could have raised during Dr. Shannon's testimony. Contrary to Lowry's assertion, the State did not present evidence at trial with impunity.

Simply put, Lowry has failed to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances.

b. *Sevart's Failure to Use Two Documents in Questioning Dr. Shannon*

Next, Lowry argues that Sevart was ineffective by failing to confront Dr. Shannon with two reports on cross-examination, the result of which would have cast doubt on Dr. Shannon's conclusions that Lowry suffered from pedophilia and antisocial personality disorder and scored a 6 on the Static-99.

The first report referenced by Lowry is what he describes as a "full psychological evaluation" that diagnosed Lowry as engaging in adult antisocial acts and suffering from alcoholism. Notably, the report does not indicate that Lowry suffers from pedophilia or antisocial personality disorder. Lowry contends that Sevart should have used this report to question Dr. Shannon about his conclusion that Lowry suffers from the two disorders.

But Lowry misconstrues the context in which the report was written. The document at issue—an intake summary—is from April 26, 1989, and details the findings of a 1-hour intake session that Lowry underwent at the Sedgwick County Mental Health Department. The cover letter to the report, dated January 8, 1990, specifically states that Lowry did not undergo a "psychological examination." Furthermore, the diagnoses contained in the report are explicitly described as "tentative," and the report defers making a personality disorder diagnosis. Although the report describes one diagnosis of Lowry as "Adult Antisocial Acts," it notes parenthetically that the acts at issue are "[i]ncest and indecent liberties."

The second document referenced by Lowry is a "Clinical Service Report for the Kansas Parole Board" written in 2003. The report was written following a short interview with Lowry (1 hour and 30 minutes). While the authors of the report ruled out pedophilia, nonexclusive, they did diagnose Lowry with suffering from a "per-

sonality disorder, not otherwise specified." And, although the authors gave Lowry a score of 4 on the Static-99 (indicating that Lowry had a medium-high chance of reoffending), the authors also used the RRASOR test to evaluate Lowry. The results of this test showed that Lowry scored a 5, indicating that Lowry had a 49.8 percent chance of reoffending within 5 years after release and a 73.1 percent chance of reoffending within 10 years after release. Notably, the report stated that "[t]he results of the Static 99 and the RRASOR show that the prognosis for this inmate to successfully complete parole and not re-offend again is poor."

Although the two reports may have contained some conclusions about Lowry that were at odds with the conclusion reached by Dr. Shannon, the first report does not discuss the results of a full psychological evaluation and thus would not have detracted from Dr. Shannon's conclusions that Lowry suffered from pedophilia and antisocial personality disorder and scored a 6 on the Static-99. Meanwhile, the second report contains more damaging information than it does beneficial. Considering all of the circumstances, we are not persuaded that counsel's representation fell below an objective standard of reasonableness.

c. *Sevart's Failure to Argue that the Elements of Pedophilia Contained in the DSM-IV Were Not Established in this Case*

Next, Lowry argues Sevart should have used the elements of pedophilia listed in the DSM-IV to argue that the State failed to present sufficient evidence at trial to show that Lowry suffered from that abnormality. But there is no requirement under the KSVPA that the State must establish that a person suffers from a mental abnormality recognized by the DSM-IV before that person can be found to be a sexually violent predator. See *In re Care & Treatment of Dahl*, No. 96,728, 2007 WL 2768036, at *2 (Kan. App. 2007) (unpublished opinion). By statutory definition, a mental abnormality is "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." K.S.A. 59-29a02(b); PIK Civ. 3d 130.21. Presuming that the plain language

of the statute expresses the legislature's intent, there is no indication that the legislature intended mental abnormalities or personality disorders to be limited to those specifically referenced in the DSM-IV. Consequently, the State is not required to establish the elements of a mental abnormality (as defined by the DSM-IV) before a person can be declared a sexually violent predator. Because such an argument lacks merit, Sevart's performance was not deficient for failing to raise the argument at trial or for failing to question Dr. Reid and Dr. Shannon about the elements of pedophilia listed in the DSM-IV.

### d. *Sevart's Failure to Seek the Assistance of an Expert Due to His Belief that Funds for an Expert Were Unavailable*

Finally, Lowry claims Sevart was ineffective for failing to seek the assistance of an expert due to a mistaken belief that there was no funding available to do so. The record shows that Sevart expressed frustration numerous times with the budget he was given to defend Lowry. But, contrary to Lowry's claim, the record also shows that Sevart did seek the assistance of an expert. Specifically, Sevart hired Dr. Barnett to review Dr. Shannon's evaluation of Lowry and to review other evaluations and documents contained in Lowry's file. Sevart also had Dr. Barnett interview Lowry at the Sedgwick County jail. In fact, there is a journal entry in the record showing that the district court, based on Sevart's motion, ordered the Board of Sedgwick County Commissioners to pay Dr. Barnett $1,250 for his "Clinical Review, Mental Status Examination, Psychological Testing, Review of Records, Consultation with Attorney, and his commute to provide services." Sevart noted at the *Van Cleave* hearing that after speaking to Dr. Barnett, he concluded that the doctor's opinion was not helpful to Lowry and that his testimony at trial was potentially damaging to Lowry's case.

In light of the circumstances presented, we find Sevart's decision to refrain from seeking the services of another expert was a reasonable one. See *Rowland v. State*, 289 Kan. 1076, 1083-84, 219 P.3d 1212 (2009) (If counsel has made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is vir-

tually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable exactly to the extent a reasonable professional judgment supports the limitation on the investigation.); *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th Cir.) (Counsel is not required to " 'continue looking for experts just because the one he has consulted gave an unfavorable opinion.' "), *cert. denied* 516 U.S. 849 (1995).

Based on the above analysis, we are not persuaded that Sevart's representation fell below an objective standard of reasonableness. To the contrary, the transcript of Lowry's trial shows that Sevart was well prepared and performed admirably in defending Lowry. Because there is no evidence of deficient performance, it is unnecessary to address the prejudice prong of Lowry's ineffective assistance of counsel claim.

### 3. *Prosecutorial Misconduct*

Finally, Lowry argues that he did not receive a fair trial due to comments made by the State during its rebuttal argument.

Recently, a panel of this court in *In re Care & Treatment of Ontiberos* stated that "complaints of prosecutorial misconduct, common in our criminal jurisprudence, are inappropriate in sexually violent predator proceedings" and, thus, the two-step analysis used in criminal cases to judge alleged instances of prosecutorial misconduct claims is inapplicable in sexually violent predator cases. 45 Kan. App. 2d at 247. Instead, the central consideration for a court reviewing comments made by counsel during a sexually violent predator proceeding is whether the comments deprived the respondent of a fair trial. 45 Kan. App. 2d at 248.

After Sevart argued during his closing argument that the conditions placed on Lowry while on parole would be sufficient to ensure that he would not reoffend, the State presented its rebuttal argument, during which counsel stated:

"I'm asking you to follow the law. Hold me to the burden the law requires of me.

"This parole plan, it's handy, it's not, but it doesn't come from him. There is something the parole board imposed on him you shall do, and they give out a litany of things he's going to be required to do. Great.

"The question is, has he learned anything. Can he articulate what he will do.

"Unless there's a parole officer standing at his hip 24/7 until 2020, that is not worth the paper it's written on.

"He has to—this has to last him the rest of his life. He has to show you—he has to show that he has learned something; that he can, indeed, change; that he is no longer a risk.

. . . .

"What he actually changed. Can he tell the doctors that he's changed.

"I understand the static test only looks at static things. MnSOST, we can mock it all you want. Well, it's generally accepted test in the field. They look at all kinds of things. Other treatments he's been through, they still find that he's in that moderate risk. He is beyond just he doesn't pose a risk, he still poses a risk.

"Worked in the kitchen. His son thought he had some good part to him, he wasn't worth throwing away, he needs treatment.

"I understand there are—he's not some knuckle dragging mean guy who beats people up in the yard at prison.

"The question is, his pedophilia, his anti-social personality disorder cause him to pose a risk. The tests say yes. He can't prove to the doctors otherwise.

"Mr. Sevart: I'll object to burden shifting.

"THE COURT: Sustained.

"One minute.

"MR. BENNETT [the State's attorney]: I have to prove beyond a reasonable doubt. Don't misunderstand my statement.

"When given the opportunity to explain himself to those doctors, he can not do it after all this time.

"As Mr. Sevart points out, with all that's at stake, he still can't. Does that not answer the question for you.

"Thank you."

Lowry contends the State's comments during its rebuttal argument suggested to the jurors that Lowry had the burden of proving to them that he did not pose a risk to reoffend if released on parole. But in making this argument, Lowry misconstrues the reference made within the State's comments. Specifically, the State's comments relate to Dr. Reid's and Dr. Shannon's testimonies at trial regarding Lowry's statements in response to questions posed about Lowry's past crimes. Both Dr. Reid and Dr. Shannon testified that when determining whether someone is likely to reoffend in the future, it is important to determine whether that person has accepted responsibility for his or her past crimes. Both doctors stated that Lowry's comments about his past crimes demonstrate that he did not take responsibility for his actions, which in turn demon-

strates that prior sex offender treatment programs had failed to rehabilitate Lowry.

Furthermore, Lowry described his triggers for engaging in unlawful sex acts as secrecy, dependency on work, stress, eating junk food, consuming alcohol, and not taking care of himself—normal conditions of everyday life. But, when Dr. Shannon asked Lowry how he would prevent these triggers from occurring, Lowry offered vague references to joining a support group and being involved in community activities. In his 1998 prevention plan, Lowry noted that if released from prison, he would join an Alcoholics Anonymous group, involve himself in a support group, and join a church group. When Dr. Shannon asked Lowry about his current prevention plan, Lowry described doing essentially the same things to prevent himself from reoffending. Dr. Shannon concluded that Lowry's personal plan for preventing himself from reoffending was "woefully inadequate."

Based on this evidence, we conclude the State simply was commenting on what Dr. Reid and Dr. Shannon had already indicated to the jurors—that Lowry's statements during the interviews did not correspond to what Dr. Reid and Dr. Shannon would expect from a sex offender who had been rehabilitated and prepared for life outside of prison. In other words, Lowry had failed to show the doctors that he was likely to control his behavior if released on parole. Thus, the statements at issue were simply comments on the evidence and were also in response to Sevart's closing argument, in which Sevart argued that the conditions imposed on Lowry while on parole would be sufficient to prevent him from reoffending. As such, we conclude the statements at issue did not deprive Lowry of a fair trial.

Affirmed.